No. 22-15822

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

—————————————

NATIONAL CENTER FOR PUBLIC POLICY RESEARCH,
*Appellant*,

v.

SHIRLEY N. WEBER, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF THE
STATE OF CALIFORNIA,
*Appellee*.

—————————————

## On Appeal from the United States District Court
## for the Eastern District of California
No. 21-cv-2168
Hon. John A. Mendez, District Judge

—————————————

## APPELLEE'S ANSWERING BRIEF

—————————————

ROB BONTA
*Attorney General of California*
MICHAEL L. NEWMAN
*Senior Assistant Attorney General*
LAURA FAER
*Supervising Deputy Attorney General*
EDWARD NUGENT
DELBERT TRAN
*Deputy Attorneys General*
CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
(415) 229-0110
Delbert.Tran@doj.ca.gov
*Attorneys for Appellee*

November 3, 2022

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 3

STATEMENT OF THE ISSUES ............................................................. 3

STATEMENT OF THE CASE ................................................................ 3

    A.    Historic and Ongoing Sex Discrimination Excludes Women from the Boards of California's Publicly Held Corporations .............. 3

    B.    Before SB 826's Passage, the California Legislature Tried and Considered Numerous Alternatives that Failed to Remedy the Exclusion of Women from the Boards of California's Publicly Held Corporations .................................................................. 13

    C.    California Adopts SB 826 to Remedy the Exclusion of Women from Boards of California's Publicly Held Corporations .................. 16

    D.    Procedural Background .................................................................. 20

        1.    *Meland v. Weber* ................................................................. 20

        2.    *Alliance v. Weber* ............................................................... 23

        3.    *National Center for Public Policy Research v. Weber* ............ 24

SUMMARY OF THE ARGUMENT ...................................................... 25

STANDARD OF REVIEW ................................................................... 27

ARGUMENT .......................................................................................... 28

I.    NCPPR Fails to State a Valid Facial Claim Against SB 826, a Law Remedying Discrimination Against Women ................................ 28

    A.    The Supreme Court and this Court Have Repeatedly Upheld Laws—Like SB 826—that Have Used Sex-Based Classifications to Remedy the Effects of Discrimination ................. 29

    B.    SB 826 Substantially Relates to the Important State Interest in Remedying Sex Discrimination on the Boards of California's Publicly Held Corporations .......................................................... 33

II.    NCPPR's Contrary Arguments Lack Merit ................................. 43

i

# TABLE OF CONTENTS
## (continued)

**Page**

    A.    NCPPR Cannot Plead that SB 826 Does Not Serve an Important Government Interest ........................................................44

    B.    NCPPR Cannot Plead that SB 826 is not Substantially Related to its Goal of Remedying Sex-Discrimination in Board Selection ..........................................................................48

    C.    The District Court Properly Relied on Established Precedent to Dismiss NCPPR's Claim for Failure to State a Facial Challenge ......55

CONCLUSION ..................................................................................58

STATEMENT OF RELATED CASES      59

# TABLE OF AUTHORITIES

**Page**

CASES

*Albemarle Paper Co. v. Moody*
    422 U.S. 405 (1975).....................................................................53

*Alliance v. Weber*
    No. 21-cv-1951-JAM-AC (E.D. Cal. Oct. 26, 2021) ........................... 20, 24, 55

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009)..................................................................27, 53

*Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal.*
    *Dep't of Transp.*
    713 F.3d 1187 (9th Cir. 2013)............................................ 37, 47, 51

*Assoc. Gen. Contractors of Cal., Inc. v. City & Cnty. of San Francisco*
    813 F.2d 922 (9th Cir. 1987)...................................................*passim*

*Califano v. Webster*
    430 U.S. 313 (1977)...............................................................*passim*

*Clemens v. Centurylink Inc.*
    874 F.3d 1113 (9th Cir. 2017).........................................................53

*Crest v. Padilla*
    No. 19STCV27651 (Los Angeles Sup. Ct.)..............................................20, 22

*Disability Rts. Mont., Inc. v. Batista*
    930 F.3d 1090 (9th Cir. 2019)........................................................27

*Doe v. Kamehameha Schools*
    470 F.3d 827 (9th Cir. 2006) (en banc) ...........................................52

*Eldredge v. Carpenters 46 N. Cal. Cntys. Joint Apprenticeship &*
    *Training Comm.*
    94 F.3d 1366 (9th Cir. 1996)........................................................40

# TABLE OF AUTHORITIES
## (continued)

Page

*Ensley Branch, N.A.A.C.P. v. Seibels*
  31 F.3d 1548 (11th Cir. 1994)................................................................52

*Equal Emp't Opportunity Comm'n v. Inland Marine Indus.*
  729 F.2d 1229 (9th Cir. 1984)..............................................................38

*Fortson v. Los Angeles City Attorney's Off.*
  852 F.3d 1190 (9th Cir. 2017)..............................................................30

*Frontiero v. Richardson*
  411 U.S. 677 (1973)..............................................................................38

*Fullilove v. Klutznick*
  448 U.S. 448 (1980)......................................................................49, 50

*Gratz v. Bollinger*
  539 U.S. 244 (2003)..............................................................................49

*Grutter v. Bollinger*
  539 U.S. 306 (2003)......................................................................*passim*

*Higgins v. City of Vallejo*
  823 F.2d 351 (9th Cir. 1987)................................................................48

*Judd v. Weinstein*
  967 F.3d 952 (9th Cir. 2020)................................................................27

*Kahn v. Shevin*
  416 U.S. 351 (1974)......................................................................*passim*

*Karasek v. Regents of Univ. of Cal.*
  956 F.3d 1093 (9th Cir. 2020)..............................................................56

*Khoja v. Orexigen Therapeutics, Inc.*
  899 F.3d 988 (9th Cir. 2018)..................................................................3

*Lynn v. Regents of Univ. of Cal.*
  656 F.2d 1337 (9th Cir. 1981)..............................................................38

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Mack v. S. Bay Beer Distribs.*
    798 F.3d 1279 (9th Cir. 1986) ................................................................3, 28

*Meland v. Weber*
    2 F.4th 838 (9th Cir. 2021) (*Meland I*) ......................................................*passim*

*Meland v. Weber*
    No. 2:19-CV-02288-JAM-AC, 2021 WL 6118651 (E.D. Cal. Dec.
    27, 2021) (*Meland II*) ................................................................ 19, 21, 22, 43

*Michael M. v. Superior Court*
    450 U.S. 464 (1981) ......................................................................................46

*Miss. Univ. for Women v. Hogan*
    458 U.S. 718 (1982) ......................................................................................30

*Monterey Mech. Co. v. Wilson*
    125 F.3d 702 (9th Cir. 1997) .........................................................................48

*Nat'l Ctr. for Pub. Pol'y Rsch. v. Weber*
    No. 21-cv-2168-JAM-AC (E.D. Cal. Dec. 21, 2021) .................................20, 24

*Nat'l Ctr. for Pub. Pol'y Rsch. v. Weber*
    No. 22-15822 (9th Cir. Oct. 3, 2022) ..........................................................2, 25

*Nev. Dep't of Hum. Res. v. Hibbs*
    538 U.S. 721 (2003) ......................................................................................13

*Orellana v. Mayorkas*
    6 F.4th 1034 (9th Cir. 2021) ........................................................................3, 28

*Price Waterhouse v. Hopkins*
    490 U.S. 228 (1989) ......................................................................................38

*Regents of Univ. of Cal. v. Bakke*
    438 U.S. 265 (1978) ................................................................ 30, 31, 48, 50

*Richmond v. J.A. Croson Co.*
    488 U.S. 469 (1989) .................................................................................47, 48

# TABLE OF AUTHORITIES
## (continued)

Page

*S.D. Myers v. City & Cnty. of San Francisco*
    253 F.3d 461, 467 (9th Cir. 2001) ..................................................28

*Schlesinger v. Ballard*
    419 U.S. 498 (1975) ............................................................*passim*

*United States v. Esquivel*
    88 F.3d 722 (9th Cir. 1996) ............................................................3

*United States v. Raines*
    362 U.S. 17 (1960) ......................................................................28

*United States v. Salerno*
    481 U.S. 739 (1987) ..............................................................25, 28

*United States v. Virginia*
    518 U.S. 515 (1996) ........................................................29, 40, 44

*W. States Paving Co. v. Washington State Dep't of Transp.*
    407 F.3d 983 (9th Cir. 2005) ........................................................37

*Wash. State Grange v. Wash. State Republican Party*
    552 U.S. 442 (2008) ....................................................................28

*Weinberger v. Wiesenfeld*
    420 U.S. 636 (1975) ....................................................................47

*Whitaker v. Tesla Motors, Inc.*
    985 F.3d 1173 (9th Cir. 2021) ......................................................27

**STATUTES**

United States Code, Title 28
    § 1331 ........................................................................................3
    § 1343(a) ....................................................................................3

United States Code, Title 42
    § 2000e-2 ..................................................................................13

# TABLE OF AUTHORITIES
## (continued)

**Page**

California Civil Code
    § 51 ................................................................................13, 40

California Corporation Code
    § 2115.5(b) ............................................................................18
    § 301.3(a) ...........................................................17, 18, 39, 40
    § 301.3(a)-(b) ................................................................39, 48
    § 301.3(b) ..............................................................................18
    § 301.3(d) .......................................................................19, 52
    § 301.3(e)(1) .........................................................................19
    § 301.4 ..................................................................................23
    § 318 .....................................................................................13

California Government Code
    § 12940(a) ......................................................................13, 40

California Stat. 2018
    Chapter 954 § 1(a) ...............................................................44
    Chapter 954 § 1(c)(2) .......................................................9, 35
    Chapter 954 § 1(c)(3) ...........................................................54
    Chapter 954 § 1(d), (e)(4) ....................................................44
    Chapter 954 § 1(e) ........................................................*passim*
    Chapter 954 § 1(e)(1) .............................................................6
    Chapter 954 § 1(e)(4) ...........................................6, 8, 34, 51
    Chapter 954 § 1(f)(1)-(2) ...............................................7, 42
    Chapter 954 § 1(f)(3) ......................................................7, 34
    Chapter 954 § 1(g)(1) ...........................................18, 26, 39, 40

## CONSTITUTIONAL PROVISIONS

California Constitution
    Article I, § 7 .........................................................................20

United States Constitution
    Fourteenth Amendment .......................................................46

**INTRODUCTION**

This Court has long recognized the government's "broad power" to address the entrenched barriers "exclud[ing] women from participating fully in our economic system." *Assoc. Gen. Contractors of Cal., Inc. v. City & County of San Francisco*, 813 F.2d 922, 940 (9th Cir. 1987). Generations of women have advanced in business schools, excelled in corporate leadership, and founded millions of businesses. Yet as of 2018, the doors to boardrooms of publicly held corporations in California largely remained closed to qualified women, despite decades of efforts by California (and others) to remedy this problem.

In response—and after nine legislative hearings—California's Legislature adopted Senate Bill No. 826 (SB 826) to break open the "[g]lass ceiling" that had been "bolted shut with metal." Appellee's Mot. to Take Judicial Notice (hereinafter MJN), Ex. 8 at 5. SB 826 requires publicly held corporations headquartered in the State—which today total slightly more than 700 of the more than one million corporations that call the State home—to add a critical mass of women to their boards, while allowing corporations to add as many seats to their boards for as many men as they wish.

Appellant National Center for Public Policy Research (NCPPR) raises a facial equal protection challenge against SB 826, arguing that the district court erred by dismissing its complaint for failure to plausibly allege a claim. But the district

court properly dismissed NCPPR's claim for failing to overcome the demanding threshold for facial challenges. The Supreme Court and this Court have repeatedly held that states may use sex-based classifications to remedy discrimination and enable women "to assume their rightful place in business." *Assoc. Gen. Contractors of Cal.*, 813 F.2d at 940. Further, SB 826 is at least as well-tailored as other sex-conscious remedial statutes that this Court has upheld under intermediate scrutiny. In upholding such statutes, this Court has rejected challenges raising the same arguments that NCPPR raises here, and the district court properly dismissed NCPPR's insufficient complaint based on this precedent. While laws and other measures to combat sex discrimination in the workplace have resulted in significant changes for women, when it comes to boardrooms in the State's publicly held corporations, the "job market [remains] inhospitable," as a result of "overt discrimination" and the "male-dominated culture." *Kahn v. Shevin*, 416 U.S. 351, 353 (1974).[1]

---

[1] The Secretary notes that a related appeal before this Court, *Meland v. Weber*, No. 22-15149, has been held in abeyance pending a final outcome in related state court litigation. *See infra* p. 22. The Secretary moved to stay this appeal pending a decision in *Meland*, but the stay motion was denied, subject to reconsideration by this panel. *Nat'l Ctr. for Pub. Pol'y Rsch. v. Weber*, No. 22-15822 (9th Cir. Oct. 3, 2022) (Dkt. 18).

## JURISDICTIONAL STATEMENT

Appellant NCPPR asserts that the district court had jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343(a). AOB 2. The Secretary's position, however, is that if this case proceeds, discovery will demonstrate that the district court lacks Article III jurisdiction because NCPPR lacks standing. *See infra* p. 29 note 17.

## STATEMENT OF THE ISSUES

Whether National Center for Public Policy Research plausibly states a facial equal protection claim against SB 826.

## STATEMENT OF THE CASE

### A.   Historic and Ongoing Sex Discrimination Excludes Women from the Boards of California's Publicly Held Corporations

California enacted SB 826 "to remedy a long and well-documented history of discrimination depriving women of equal opportunity (or, in many cases, any opportunity at all) to serve on corporate boards." MJN, Ex. 11 at 12.[2]

---

[2] As the Secretary explains more fully in her motion to take judicial notice, the Court may consider the legislative record on a motion to dismiss. *See Mack v. S. Bay Beer Distribs.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *rev'd on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 106 (1991); *Orellana v. Mayorkas*, 6 F.4th 1034, 1042–43 (9th Cir. 2021). Additionally, the Court may consider legislative materials "for the first time on appeal" because there is no "reasonable dispute" that these are the records that the Legislature relied upon when enacting SB 826. *See United States v. Esquivel*, 88 F.3d 722, 726–27 (9th Cir. 1996). NCPPR asserts that records cannot be judicially noticed if they contain "disputed facts," AOB 25 (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d

3

As witnesses testified before the Legislature, countless women in California and beyond have long been "eminently qualified" to serve on corporate boards. MJN, Ex. 6 at 53.[3] In 2018, the President of the California chapter for the National Association of Women Business Owners testified to the California Legislature about "many" of the more than "1.5 million women business owners across the State" who "are qualified to serve on boards[.]" MJN, Ex. 3 at 10; *see also* MJN, Ex. 12 at 6 (bill analysis noting California's women business owners provide 1.9 million jobs and generate $318.2 billion in annual revenue); Ex. 13 at 7 (same). Over 100 California business leaders and associations affirmed that "[t]he pipeline of qualified women candidates . . . is overflowing with experienced and capable women leaders." MJN, Ex. 23; *see also* MJN, Ex. 21 (founder of organization of 300 California CEOs stating that there is "an abundance of qualified women leaders" for corporate boards); MJN at 8 n.1 (noting over 100 similar letters of support sent to the Legislature). Registries of board-ready women compiled by Stanford, Harvard, Northwestern, and UCLA reflect "thousands of qualified . . . executive and experienced women . . . [certified as] qualified for serving on corporate boards." MJN, Ex. 3 at 5; *see also* MJN, Ex. 2 at 22; MJN, Ex. 26 at 2.

---

988, 999 (9th Cir. 2018)), but NCPPR cannot dispute that these records represent the legislative history for this statute.

[3] NCPPR does not allege otherwise in its complaint or this appeal. *See generally* AOB; ER-67-76.

Indeed, as of 1984, the number of women in graduate schools surpassed the number of men, and a decade ago, women became a majority of workers in "management, professional, and related occupations[.]" Comm. for Econ. Dev., Fulfilling the Promise: How More Women on Corporate Boards Would Make America and American Companies More Competitive 12 (2012), https://tinyurl.com/4tt2xf73; *see also* MJN, Ex. 26 at 5 & n.20 (letter from SB 826's author to Governor, citing Committee for Economic Development study).[4] As one corporate board member testified, women "are foundation board members, we are trustees of universities and educational institutions, we are commissioners, we are leaders in the corporate world, we are leaders in the arena of government. We need now to be leaders of board[s] of directors." MJN, Ex. 9 at 144.

Yet, when it comes to corporate boardrooms, the California Legislature found that these countless women "have not been given a chance." MJN, Ex. 2 at 22.

---

[4] *See also* MJN, Ex. 12 at 4 (identifying the hundreds of thousands of board-ready women included in the Equilar Diversity Network, National Association of Corporate Directors, and National Association of Women Business Owners); MJN Ex. 12 at 6 (identifying board-ready women in Athena Alliance, Directors Academy, and Bay Area Women Leadership Roundtables); MJN Ex. 22 at 2 (almost 400 women serving in the C-suite of California's largest companies in 2016); MJN, Ex. 26 at 2 (in 2016, "women earn[ed] 57 percent of bachelor's degrees, more than 62 percent of master's degrees and 53 percent of PhDs, medical degrees and law degrees").

Though they are more than qualified to serve, "the doors are closed for even consideration." MJN, Ex. 3 at 10. On the eve of SB 826's passage, the California Legislature found that "[o]ne-fourth of California's public companies in the Russell 3000 Index have NO women on their boards of directors." Cal. Stat. 2018, ch. 954, § 1(e) (capitalization in original).[5] For the 50 smallest California Russell 3000 corporations, 48%—or nearly half—did not have a single woman director. *Id.* § 1(e)(4). For the remaining corporations, disparities remained "vast[]" and persistent. MJN, Ex. 11 at 12. Among the 446 California public corporations in the Russell 3000 Index, women held only 15.5% of the board seats. Cal. Stat. 2018, ch. 954, § 1(e)(1). Women held only 566 seats in total, while men held 3,089 seats. *Id.* Comparing these figures to national ones, the Legislature found that California's numbers are "even [worse than] the national percentages," MJN, Ex. 2 at 10, and that California lagged "behind the rest of the country." MJN, Ex. 9 at 35.

Moreover, the Legislature found that discrimination against women in corporate board selection has been a "long[-]standing" problem within the State. *See* MJN, Ex. 3 at 14. As early as 1993, the Legislature recognized the "glass ceiling" for women in the boards of publicly held corporations. MJN, Ex. 16. From 2006 to 2018, the percentage of California board seats held by women increased

---

[5] The Russell 3000 reflects the top 3,000 publicly traded U.S. companies, as ranked by the value of the companies' market capitalization (i.e., their outstanding shares).

6

only slightly, from 8.8% to 15.5%. *Compare* MJN, Ex. 27 at 6, *with* Cal. Stat. 2018, ch. 954, § 1(e). Nearly half of the 75 largest corporations that went public nationwide from 2014 to 2016 did so without a single woman on their boards. Cal. Stat. 2018, ch. 954, § 1(f)(3). As the Legislature found, if then-current trends continued, without further "proactive steps," MJN, Ex. 12 at 1, Ex. 13 at 2 (bill analyses), women would not have equal opportunity to participate on boards for another 40 years, Cal. Stat. 2018, ch. 954, § 1(f)(1)-(2); *see also* S. Conc. Res. No. 62, 2013–2014 Leg., Reg. Sess. (Cal. 2013) (seeking "equitable" gender representation on corporate boards). The Legislature reviewed data that showed virtually no improvement in women's representation on corporate boards without concerted action to remedy the exclusion. *See* Comm. for Econ. Dev., Fulfilling the Promise: How More Women on Corporate Boards Would Make America and American Companies More Competitive 12 (2012), https://tinyurl.com/4tt2xf73; *see also* MJN, Ex. 26 at 5 & n.20 (letter from SB 826's author to Governor, citing study). Evidence showed that the problem would not fix itself, and that further "proactive steps" were needed. *See, e.g.*, MJN, Ex. 12 at 1, Ex. 13 at 2 (bill analyses); MJN, Ex. 26 at 5 ("Companies have failed time and again to right this injustice on their own.").

The Legislature's data further showed that women were excluded from or underrepresented on the boards of California's publicly held corporations of every

size, in every industry, and in every region. By industry, the percentage of companies without a single woman on their boards before SB 826 were: 59% (semiconductors); 41% (real estate); 35% (pharmaceuticals); 31% (financial services); 30% (health care); 30% (technology hardware); 29% (energy, materials & industrials); 28% (consumer goods); 22% (technology software); and 11% (utilities and communications). MJN, Ex. 27 at 11. Women were also underrepresented in every industry—women made up no more than 15.5% of total directors in all industries, except the utilities and communication industry where they made up only 24.7% of directors. *Id.*[6] In the semiconductors industry, for example, women made up just 6.9% of directors. *Id.* Underrepresentation also extended statewide: women made up 15.2% of board directors in the Central Coast, 14.5% of directors in the Bay Area, 11.7% of directors in Southern California, and 2.6% of directors in the Central Valley. *Id.* at 13. And both large and small California corporations excluded women; nearly 50% of small corporations did not have single woman on their boards. *See supra* at p. 6; Cal. Stat. 2018, ch. 954, § 1(e)(4).

---

[6] The figures from the utilities industry represent an outlier because they represent less than ten companies. *See* MJN, Ex. 18 at 4-5 (California Research Bureau "caution[ing] against generalizing about the industry," given limited sample).

Investigating further, the Legislature found these disparities to be the product of sex-based discrimination. The Senate Office of Research identified "a number of barriers to women's participation in corporate leadership," including sex-stereotypes against women. MJN, Ex. 17 at 1-3. "One group of researchers reviewed 69 studies on stereotypes and leadership and found that stereotypically male characteristics," such as "independence" or "competitiveness," are "overwhelmingly associated with expectations for leadership success"; but the researchers found that women who displayed those behaviors while aspiring to corporate leadership were punished as "abrasive," while those who did not embrace those behaviors were "seen as weak and unassertive." *Id.* at 2. Such discrimination persisted, even when accounting for qualifications: the Senate Office of Research cited a "long-term study of more than 4,000 alumni who graduated between 1996 and 2007 from MBA programs at leading business schools" that found "male graduates were *twice* as likely as their female counterparts to be at the CEO/senior executive level." *Id.* at 3 (emphasis added).

Similarly, the Legislature cited a 2014 Credit Suisse study stating that "cultural bias is an impediment to the appointment of women [on boards] and maintains the glass ceiling." MJN, Ex. 29 at 32; *see* Cal. Stat. 2018, ch. 954, § 1(c)(2) (citing 2014 Credit Suisse study). The Credit Suisse study discussed research demonstrating "double standards" applied to men and women; "implicit

9

favoritism" for men in how qualifications are rated; and a "double-blind study at Yale" where male applicants with an identical resume to a female applicant were rated higher on "competence, hireability," desirability for mentorship, and offered a higher starting salary than the female applicant. MJN, Ex. 29 at 33-34, 37.

The Legislature also heard testimony about how the board selection process tends to exclude women. Witnesses explained that the board selection process is not like an ordinary job application: it is "not a competition" where an open position is posted, candidates apply, "you line up the best candidates[,]" and "the best one is chosen." MJN, Ex. 3 at 6. Instead, a corporation's board typically has a nominating and governance committee that meets "behind closed doors" to select a new board director by identifying candidates based on whom they already know. *See* MJN, Ex. 4 at 3. As a board recruiter stated, "the big myth is that people think that search firms reach out and find candidates for boards." MJN, Ex. 5 at 13. Instead, "[t]he company, [directors] themselves, give us that list of their friends and they say, 'Vet those candidates.'" *Id.* As a result, boards normally "don't interview three or four" candidates for a vacancy. MJN, Ex. 3 at 7. "They only interview one . . . . generally a man[.]" *Id.*

Witnesses further explained to the Legislature that this process excludes women because male-dominated boards typically select new members from their male-dominated social networks, choosing from male "university buddies or golf

10

course buddies, or friends" already known to the corporation's leadership. MJN, Ex. 5 at 13; *see also* MJN, Ex. 6 at 52 ("The guys are comfortable with each other. And as a result, there is ... discrimination ... and women haven't been able to penetrate that ceiling."). Both witnesses and legislators observed that these male-dominated board networks formed through activities like golfing, which take place in private clubs—like the Augusta National Golf Club—that have expressly excluded women from their membership, even in recent years. MJN, Ex. 6 at 34 ("There were never any women members of Augusta . . . . And so, there comes a point as a matter of policy where we have to say there is . . . discrimination going on. And that's what we have in the board room.").[7]

Further, the Legislature heard testimony that because corporate board directors are predominantly male, boards demonstrate a bias toward selecting nominees who are likewise men. Citing research from Stanford, one former

---

[7] *See* Karen Crouse, *Augusta National Adds First Two Female Members*, N.Y. Times (Aug. 20, 2012), https://tinyurl.com/5d8ed8fd (Augusta added its first women members in 2012 after 80 years of exclusion); *see also* Michael McCann, *Why Private Golf Clubs Are Legally Still Able to Discriminate Against Women*, Sports Illustrated (Jul. 1, 2019), https://tinyurl.com/2s3v9xcr ("[I]n 2019, there are still golf clubs in America that only allow men to become members."); Frank J. Ferraro, *Prerogative or Prejudice?: The Exclusion of Women from Augusta National*, 1 DePaul J. Sports L. & Contemp. Probs. 39, 40 (2003) (describing Augusta National Golf Club's "[d]iscrimination based on gender" and how the club's treatment of women was "on par with that of other golf clubs across the country").

11

corporate board member observed, "typically . . . a man . . . being replaced on a board . . . will be replaced by another man," MJN, Ex. 9 at 115, reinforcing male-dominated networks. In the few instances that a board considered a woman candidate, witnesses testified that boards asked for a woman "who doesn't talk too much" or "disrupt too much." MJN, Ex. 2 at 8. One board recruiter testified, "I actually had a nominating chair say that to me, don't bring us a woman who is too disruptive. . . . [bring us] one who doesn't ask too many questions[.]" MJN, Ex. 9 at 125.

This evidence reaffirmed hearings held prior to SB 826's introduction, where the Legislature had identified other discriminatory barriers, including how corporations "giv[e] subpar assignments to women after they return from maternity leave, assuming they won't be able to perform at the same caliber as their male counterparts." MJN, Ex. 9 at 19. In other cases, "[t]he exclusion of female employees from social interactions at work deprives them of crucial information[], mentoring, and access to power." *Id.* at 18.

After reviewing the evidence, the Legislature concluded that the boards of California's publicly held corporations have maintained an "old boys' network," MJN, Ex. 10 at 8, that has created a "[g]lass ceiling . . . bolted shut with metal," MJN, Ex. 8 at 5.

**B. Before SB 826's Passage, the California Legislature Tried and Considered Numerous Alternatives That Failed to Remedy the Exclusion of Women from the Boards of California's Publicly Held Corporations**

Confronted with evidence of exclusion, the Legislature considered the decades-long "list of efforts" by the State and others that failed to remedy this discrimination. MJN, Ex. 6 at 5.

State and federal laws have barred sex discrimination in private corporations and in employment since 1959, *see* Cal. Civ. Code § 51; Cal. Gov't Code § 12940(a); 42 U.S.C. § 2000e-2, but they proved ineffective in stopping discrimination in the selection of board members at publicly held corporations.[8] Responding to claims that California's corporate boards lacked women because qualified women could not be found, in 1993 the Legislature created a registry to identify qualified women candidates. *See* Cal. Corp. Code § 318; MJN, Ex. 26 at 2 ("The assertion that there are insufficient number of women to fill these seats is simply untrue, as the existing registries . . . attest."). The Legislature also received testimony showing that privately run registries had long been available through elite business schools such as Stanford and Harvard. MJN, Ex. 2 at 22, Ex. 3 at 5. And nearly a decade before SB 826, California's Public Employees' Retirement

---

[8] *See Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 729–30 (2003) ("Congress responded to this history of discrimination . . . [with] Title VII of the Civil Rights Act of 1964 . . . . But . . . gender discrimination did not cease.").

13

System (CalPERS) and California State Teachers' Retirement System (CalSTRS)—state agencies operating pension funds comprising hundreds of billions of dollars—launched another registry of qualified board candidates with diverse backgrounds. MJN, Ex. 20 at 3, Ex. 25 at 1.[9] But these, too, did not remedy the exclusion and underrepresentation of women on the boards of California's publicly held corporations. *See* MJN, Ex. 25 at 1-2 (noting efforts by CalSTRS and CalPERS to promote board diversity, including a database of qualified candidates, did not work "by a long shot"); *see also* MJN, Ex. 20 at 1-2.

Still other measures to encourage California's corporate boards to stop excluding qualified women were implemented. In 2008, the State Controller directed CalPERS and CalSTRS to prioritize corporate board diversity in their investment decisions. MJN, Ex. 18 at 1 & n.4. CalPERS published evidence of the benefits of gender-diverse boards and sent letters to over 100 California corporations in which it invests, explaining to them the importance of board diversity. *See* MJN, Ex. 20 at 1-3.

CalSTRS led similar efforts to persuade boards to end discrimination against women board candidates. It contacted over 100 California corporations, informing

---

[9] CalPERS and CalSTRS are two of "the largest pension funds in the country." MJN, Ex. 18 at 1; *see also Investment & Pension Funding*, https://tinyurl.com/cram3fbv.

them of the benefits of gender diversity to encourage them to adopt diversity policies and select qualified women. *See* MJN, Ex. 20 at 3. CalSTRS petitioned the Securities Exchange Commission (SEC) to promulgate regulations requiring proxy statements to disclose board nominees' gender. MJN, Ex. 25 at 1; *see also* MJN, Ex. 20 at 3. It also partnered with organizations to push corporations to meet the goal of having women fill 30% or more of board seats. MJN, Ex. 9 at 72. But on the eve of SB 826's introduction, more than 26% of boards for California's publicly held corporations had no women. *See* Cal. Stat. 2018, ch. 954, § 1(e).

Even further efforts continued to prove ineffective at remedying discrimination in the board selection process. Starting in 2009, the Securities Exchange Commission (SEC) required public corporations to disclose how they considered diversity in nominating new board members. 17 C.F.R. § 229.407(c)(2)(vi). In 2011, California's Insurance Commissioner launched an initiative to address the exclusion of women (among others) on corporate boards by collecting and issuing annual public reports on gender-diversity data for corporate boards and pushing companies to appoint diverse directors. Still, five years later, 80% of insurance company board seats nationwide were held by men, and 15% of insurance companies had *no* women on their boards. MJN, Ex. 9 at 61-63, Ex. 24.

15

In 2013, the Legislature unanimously approved Senate Concurrent Resolution No. 62 to "encourage equitable" gender representation on corporate boards. S. Conc. Res. No. 62, 2013–2014 Leg., Reg. Sess. (Cal. 2013) (SCR 62); *see also* MJN, Ex. 10 at 9 (enacting SCR 62 because women "were not allowed, encouraged, and promoted because of their gender"). Citing studies demonstrating the many benefits of gender-diverse boards, SCR 62 urged California's publicly held corporations to have a minimum number of women directors, commensurate with board size, within three years. S. Conc. Res. No. 62, 2013–2014 Leg., Reg. Sess. (Cal. 2013). But the resolution had almost no effect: as a California legislative committee found in 2017, "despite existing law and the encouragement of SCR 62, not much has changed[.]" MJN, Ex. 11 at 2. The percentage of women on boards increased "by one or two percent" after three years, and "fewer than 20 percent" of corporations met the targets encouraged by the Legislature. MJN, Ex. 6 at 4.

### C. California Adopts SB 826 to Remedy the Exclusion of Women from Boards of California's Publicly Held Corporations

As other efforts failed to remedy the exclusion of women from the boardrooms of California's publicly held corporations, California decided that further "proactive steps" were needed. MJN, Ex. 12 at 1, Ex. 13 at 2 (bill analyses). In 2018, the Legislature held nine separate hearings on SB 826, *see* MJN, Ex. 1, during which the relevant committees reviewed the State's prior efforts and

considered evidence demonstrating that none of those efforts had been sufficient to break the "impenetrable walls of discrimination" blocking qualified women from California's publicly held corporations' boards. MJN, Ex. 6 at 35. As SB 826's author explained, the State had "tried other methods to get to the same result," *id.* at 53, including "with the registry," a "gentle urging" in 2013, and other initiatives, but the answer that the State consistently received was to "go pound sand," *id.* at 34-35, 53. The Legislature also considered other options, including a policy modeled after the National Football League's "Rooney Rule," which requires teams to interview candidates of color for coaching and other senior positions. MJN, Ex. 5 at 7. But it rejected that option after considering evidence that the Rooney Rule had been largely unsuccessful. *Id.* ("[B]oards can easily sidestep [the Rooney Rule] without any meaningful consideration of these candidates. . . . The rule itself . . . doesn't really . . . appear to have had [a] meaningful impact on the lack of diversity in coaching.").

Following those hearings, the Legislature enacted SB 826 "to break that glass ceiling" blocking women from corporate boardrooms. MJN, Ex. 6 at 38. SB 826 requires publicly held corporations headquartered in California to "have a minimum of one female director on [their] board[s]" by the end of 2019. Cal. Corp.

Code § 301.3(a).[10] Beginning at the end of 2021, California's publicly held corporations with five-member boards were required to have at least two female directors, and those with six or more members were required to have at least three female directors. *Id.* § 301.3(b). When establishing those requirements, the Legislature relied upon research revealing that boardrooms needed a critical mass of women—up to three, depending upon the size of the board—to eliminate stereotyping, tokenism, and exclusion in the boardroom. *See* Cal. Stat. 2018, ch. 954, § 1(g)(1).

"A corporation may increase the number of directors on its board" to meet these requirements. *Id.* § 301.3(a). Indeed, corporations may add as many seats to their boards as they desire. *See id.*; MJN, Ex. 6 at 10 ("[B]oards can elect to add a seat, change their by-laws midyear, and vote on it at the end of the year."); MJN, Ex. 9 at 52 (corporate board member stating, "[t]here's nothing wrong with adding a seat. You can go from eight to ten, you can go from eleven to twelve"). And rather than imposing these requirements on all corporations in California, the Legislature took a "more narrow" focus, MJN, Ex. 5 at 8, targeting only

---

[10] Publicly held corporations are corporations with shares listed on the New York Stock Exchange (NYSE), National Association of Securities Dealers Automated Quotations (NASDAQ), or the NYSE American. *See* Cal. Corp. Code § 2115.5(b).

California's 716 publicly held corporations, which account for 0.07% of the more than one million stock corporations registered to do business in California.[11]

SB 826 also requires the Secretary to publish an annual public report documenting the number of covered corporations (1) that, during at least one point during the preceding year, have included women as required by the statute, (2) that moved out of or into California during the preceding year, and (3) that ceased to be publicly traded. Cal. Corp. Code § 301.3(d). SB 826 provides that the Secretary "may adopt regulations to implement this section" and establishes the amount of fines the Secretary "may" impose for violations. *Id.* § 301.3(e)(1).

And SB 826 has worked, as the district court and this Court have already recognized. *See Meland v. Weber*, No. 2:19-CV-02288-JAM-AC, 2021 WL 6118651, at \*8 (E.D. Cal. Dec. 27, 2021) (*Meland II*) ("Indeed, before the legislation, 29% of California companies that would have been subject to the law 'had all-male boards, [and] as of March 1, 2021, only 1.3% . . . have all-male boards.'"); *Meland v. Weber*, 2 F.4th 838, 846 & n.3 (9th Cir. 2021) (*Meland I*)

---

[11] *See* Cal. Secretary of State, Diversity on Boards: March 2022 Report, https://tinyurl.com/2myvxtaa. In the related appeal, *Meland v. Weber*, No. 22-15149, the Secretary's brief references a lower figure, which represents the number of publicly held corporations headquartered at the time of SB 826's passage. The Secretary's most recent report documented 716 publicly held corporations headquartered in the State.

("early results have shown" that SB 826 "has nearly quadrupled the rate of companies adding women to their boards").

### D.    Procedural Background

This appeal arises from one of four lawsuits—one in state court and three in federal court—challenging SB 826.[12] All three federal lawsuits were related and assigned to the same judge in the United States District Court for the Eastern District of California. *See* Related Case Order, ECF No. 52, *Alliance v. Weber*, No. 21-cv-1951-JAM-AC (E.D. Cal. Oct. 26, 2021); Related Case Order, ECF No. 10, *National Center for Public Policy Research v. Weber*, No. 21-cv-2168-JAM-AC (E.D. Cal. Dec. 21, 2021). The district court cited and discussed its rulings in the related lawsuits when dismissing NCPPR's complaint, and the Secretary describes the court's rulings below.

### 1.    *Meland v. Weber*

In November 2019, Creighton Meland, Jr., filed suit challenging SB 826, a few months after he purchased 65 shares out of the approximately 18 million outstanding shares in a publicly held corporation headquartered in California. *Meland II*, 2021 WL 6118651 at *3. The district court initially dismissed Meland's

---

[12] In *Crest v. Padilla*, No. 19STCV27651 (Los Angeles Sup. Ct.), several taxpayer plaintiffs filed a lawsuit in the Superior Court of California, challenging SB 826 under Article I, § 7 of the California Constitution. On May 13, 2022, the Superior Court issued a ruling in favor of plaintiffs, enjoining enforcement of the statute. The Secretary has appealed that ruling, and that appeal is ongoing.

suit on standing grounds, but this Court reversed and remanded for further proceedings. *See Meland I*, 2 F.4th 838. Meland then sought a preliminary injunction, which the district court denied. *Meland II*, 2021 WL 6118651. Citing, in part, the "legislative history materials" of SB 826, the court found an "abundance of evidence supporting the legislature's determination that discrimination exists." *Id.* at *5. Applying intermediate scrutiny, the district court held that "SB 826 is substantially related to its . . . goal" in remedying sex discrimination on the boards of California's publicly held corporations. *Id.* at *8.

In doing so, the district court found this Court's intermediate scrutiny precedent "particularly instructive[.]" *Id.* at *6. Discussing *Associated General Contractors*, the district court observed that this Court "discussed the ordinance's treatment of the minority-owned businesses and women-owned businesses separately, applying distinct standards of review." *Id.* To apply intermediate scrutiny, the court quoted *Associated General Contractors*: while "the ordinance is unusual in the breadth of the subsidy it gives women" and "may well be overinclusive, we believe it hews closely enough to the city's goal of compensating women for disadvantages they have suffered so as to survive a facial challenge." *Id.* (quoting *Assoc. Gen. Contractors of Cal.*, 813 F.2d at 941). Turning to *Coral Construction*, the district court stated that the Ninth Circuit "again addressed an equal protection challenge to the validity of a county's minority and women

21

business enterprise set-aside program," rejecting a facial challenge and upholding the program's "set-aside" for women. *Id.*

Finally, the court held that a preliminary injunction would not serve the public interest. *Id.* at *8. Though Meland argued that enjoining an unconstitutional law would serve public interest, the court concluded that SB 826 "is not clearly unconstitutional." *Id.* "On the other side of the ledger," enjoining SB 826 "at this early stage may deny highly qualified women who are eager and seeking to join corporate boards the opportunities provided by SB 826," and would "shut[] out thousands of qualified women." *Id.*

Meland again appealed to this Court.[13] After the parties completed briefing, this Court *sua sponte* held the appeal "in abeyance until any appeal of the decision in *Crest et al. v. Padilla*, Case No. 19STCV27651 (Los Angeles Sup. Ct.) becomes final." Order, *Meland v. Weber*, No. 22-15149 (9th Cir. Jun. 6, 2022) (Dkt. 89); *see also supra* p. 20 note 12 (describing the status of the *Crest* proceedings).

---

[13] In the pending *Meland* appeal, the Secretary argues that the plaintiff lacks standing to pursue his claim, in light of this Court's recognition in *Meland I* that further factual development could show that the corporation's existing board—not shareholders—effectively decides the board's composition. *See* Appellee's Answering Brief at 24-29, *Meland v. Weber*, No. 22-15149 (9th Cir. Mar. 28, 2022) (Dkt. 35), citing *Meland I*, 2 F.4th at 846 n.2 (declining to "consider" this argument based on "the pleadings").

### 2. *Alliance v. Weber*

Nearly two years after Meland's suit, the Alliance for Fair Board Recruitment filed a similar suit challenging SB 826, and another statute, Assembly Bill No. 979 (AB 979), arguing that the statutes violated the Equal Protection Clause.[14] *See* SER-36-37. In January 2022, the district court granted the Secretary's motion to dismiss in part and denied it in part, dismissing Alliance's facial challenge against SB 826, but denying the motion to dismiss with respect to Alliance's challenge against AB 979. SER-28-31.

In its ruling, the district court emphasized the intermediate scrutiny standard and the strict requirements of "a facial challenge[.]" SER-11. Addressing plaintiff's arguments, the court observed that "none of the cases that plaintiff cites specifically addresses minimum gender diversity requirements[,]" let alone "applies a rule that such minimum gender diversity requirements are per se unconstitutional." SER-29. Citing the court's "prior ruling" in *Meland* "and [its] reading of the case law involving this gender law," the court concluded that a facial challenge must fail. SER-11. The court allowed Alliance to amend its complaint to bring an as-applied challenge against SB 826. SER-29-30. Alliance declined to do so, proceeding with its remaining claim against AB 979. SER-36-37.

---

[14] AB 979 requires the boards of California's publicly held corporations to add a certain number of directors from underrepresented communities to their boards. *See* Cal. Corp. Code § 301.4.

23

### 3. *National Center for Public Policy Research v. Weber*

Around the same time that Alliance filed its lawsuit, the National Center for Public Policy Research, represented by the same counsel as in *Meland*, filed the complaint giving rise to this appeal. ER-67-76. In this case, NCPPR raises the same claim Meland raised against SB 826, alleging that SB 826 violates the Equal Protection Clause, while bringing an additional equal protection claim against AB 979. ER-67-76. On April 19, 2022, applying intermediate scrutiny, the district court granted the Secretary's motion to dismiss with respect to NCPPR's facial claim against SB 826 without prejudice to NCPPR's ability to file an as-applied challenge. ER-3-4; ER-45-46. The district court also denied the Secretary's motion with respect to NCPPR's AB 979 claim, which involved a challenge to race-conscious provisions reviewed under strict scrutiny. *See* ER-3-4.

As NCPPR's complaint brought the same claim against the same statutes as the complaint in *Alliance*, the court issued an oral ruling citing its reasoning in that case: "for the same reasons that I granted and denied the motion to dismiss in the *Alliance for Fair Board Recruitment* case . . . I am doing the same in the *National Center for Public Policy Research v. Weber* case." ER-45. Though the court permitted NCPPR to amend its complaint to bring an as-applied challenge to SB 826, NCPPR declined to do so. ER-4. Instead, it voluntarily dismissed its AB 979

claim with prejudice and appealed the district court's dismissal of its facial challenge against SB 826. ER-4.[15]

## SUMMARY OF THE ARGUMENT

The district court correctly dismissed NCPPR's complaint for failure to plausibly allege a facial equal protection challenge against SB 826. A facial challenge is "the most difficult challenge to mount successfully," and can succeed only if a plaintiff establishes that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). But the Supreme Court and this Court have repeatedly recognized circumstances where laws like SB 826 may constitutionally use sex-based classifications to remedy entrenched business and employment discrimination against women. Following this well-trodden path, the Legislature enacted SB 826 to remedy the long-standing

---

[15] The Secretary previously asked this Court to stay proceedings in this case pending resolution of the related appeal in *Meland*; that motion was denied subject to reconsideration by the merits panel. *See Nat'l Ctr. for Pub. Pol'y Research v. Weber*, No. 22-15822 (9th Cir. Oct. 3, 2022) (Dkt. 18). The primary reasons for that motion—conserving resources and avoiding duplicative litigation—have less purchase now that this appeal is fully briefed.

Nevertheless, this Court should stay this case, pending the outcome of related state court litigation, as this Court did in *Meland. Meland v. Weber*, No. 22-15149 (9th Cir. Jun. 6, 2022) (Dkt. 60). Additionally, pursuant to this Court's General Orders, the Court should decide the appeal in *Meland* prior to this one. *See* Ninth Circuit Gen. Order 3.3(c) ("Generally, cases are selected for calendaring according to the order in which the notices of appeal, petitions, or applications for enforcement were filed[.]").

discrimination that has denied women the full and equal opportunity to serve on the boards of California's publicly held corporations. In enacting SB 826, the Legislature found that sex-based stereotypes, anti-female bias, and the insular, secretive board-selection process—which relies on male-dominated networks to select new directors—all continue to impede women's ability to join corporate boards.

Further, SB 826 substantially relates to its important goal of remedying discrimination: it provides a flexible floor that applies narrowly to California's publicly held corporations, covering less than one-tenth of one percent of the more than one million total stock corporations registered in the State. By requiring covered corporations to add women to their boards, SB 826 addresses a board selection process rife with discrimination—which has no advertised openings, no application process, and no open competition. SB 826 also conforms to legislative findings indicating that a critical mass of women (approximately three) is needed to reduce stereotyping, tokenism, and exclusion in the boardroom. Cal. Stat. 2018, ch. 954, § 1(g)(1).

NCPPR claims that the district court applied the wrong standard and improperly considered facts, but that misunderstands the nature of the district court's reasoning. The court referred to its prior ruling to emphasize its reading of this Court's *precedent* applying intermediate scrutiny to cases involving gender—

in doing so, the district court properly applied this Court's well-established law rejecting facial challenges like the one NCPPR brings here. In any event, there is more than sufficient evidence in the legislative record—which this Court may plainly consider at the motion to dismiss stage—to uphold SB 826.

## STANDARD OF REVIEW

This Court reviews an order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) de novo. *Judd v. Weinstein*, 967 F.3d 952, 955 (9th Cir. 2020). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Disability Rts. Mont., Inc. v. Batista*, 930 F.3d 1090, 1096 (9th Cir. 2019) (citations omitted). Plausibility requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It requires a plaintiff to plead sufficient factual content to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Though the Court accepts as true all "well-pleaded factual allegations," *id.* at 679, it will not accept as true "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021) (alteration in original) (quoting *Iqbal*, 556 U.S. at 678-79).

While a court generally limits its review to the complaint on a motion to dismiss, courts may also consider matters of "public record," including legislative history. *See Mack v. S. Bay Beer Distribs.*, 798 F.2d 1279, 1282 (9th Cir. 1986) (noting that "on a motion to dismiss a court may properly look beyond the complaint to matters of public record"); *see also Orellana v. Mayorkas*, 6 F.4th 1034, 1042–43 (9th Cir. 2021) (courts may consider matters subject to judicial notice on a motion to dismiss).

## ARGUMENT

## I.  NCPPR FAILS TO STATE A VALID FACIAL CLAIM AGAINST SB 826, A LAW REMEDYING DISCRIMINATION AGAINST WOMEN

NCPPR has not plausibly alleged that SB 826 violates the Equal Protection Clause. NCPPR argues that SB 826 is unconstitutional on its face, and thus can succeed only by establishing that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also id.* (facial challenges are "the most difficult challenge to mount successfully").[16]

---

[16] NCPPR attempts to constrain the facial standard to the facts of *Salerno* (AOB 21 n.2), but NCPPR's argument is unavailing. The Supreme Court has repeatedly applied this demanding requirement beyond the confines of *Salerno*. *See, e.g.*, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008); *United States v. Raines*, 362 U.S. 17, 21-22 (1960). And this Court has expressly affirmed that "*Salerno* is the correct standard in *every context*, with the exception of certain First Amendment cases." *S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) (emphasis added).

But well-established precedent has repeatedly approved of statutes using sex-based classifications to remedy economic discrimination against women. As the Supreme Court has recognized, "[s]ex classifications may be used" to "compensate women for particular economic disabilities they have suffered," to "promote equal employment opportunity," and "to advance full development of the talent and capacities of our Nation's people." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (citations, quotation marks, and alterations omitted). Because SB 826 is substantially related to this important state interest, the district court properly dismissed NCPPR's claim.[17]

### A. The Supreme Court and this Court Have Repeatedly Upheld Laws—Like SB 826—that Have Used Sex-Based Classifications to Remedy the Effects of Discrimination

Gender-based classifications are subject to intermediate scrutiny, meaning they are constitutional so long as they "serve an important governmental objective" and have a "direct, substantial relationship between the objective and the means

---

[17] As noted above, in the related *Meland* appeal, the Secretary has argued that the plaintiff lacks standing in light of discovery conducted in that case. *See supra* p. 22 n.13. Because this case was resolved on the pleadings, the Secretary did not argue that NCPPR lacks standing before the district court and does not raise that argument here. *See supra* p. 22 note 13. If this Court reverses the district court's judgment in this case, however, the Secretary maintains that discovery will show that NCPPR lacks standing to challenge SB 826 for the same reason that the plaintiff in *Meland* does: neither plaintiff is regulated by the statute, and thus neither could be "encouraged" to discriminate, as their actions do not affect the board's ultimate composition. *See* Appellee's Answering Brief at 24-29, *Meland v. Weber*, No. 22-15149 (9th Cir. Mar. 28, 2022) (Dkt. 35).

chosen to accomplish the objective." *Coral Constr.*, 941 F.2d at 931. To enact a remedial program, the Legislature needs to find only that "[s]ome degree of discrimination . . . occurred in a particular field before a gender-specific remedy may be instituted in that field." *Id.* at 932. Where the legislative record shows that the "members of the gender benefited by the classification actually suffer[ed] a disadvantage related to the classification," the statute must be upheld. *Assoc. Gen. Contractors of Cal.*, 813 F.2d at 940 (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 728 (1982)). The constitutionality of the program should also "be evaluated based upon all evidence presented . . . whether such evidence was adduced before or after enactment." *Coral Constr.*, 941 F.2d at 920; *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 316-17 & n.51 (considering evidence from amici); *Fortson v. Los Angeles City Attorney's Off.*, 852 F.3d 1190, 1193-94 (9th Cir. 2017) (affirming dismissal of a facial challenge, under intermediate scrutiny, by comparing statute to a federal ban approved of in light of legislative findings included with the statute's "purpose and history"). Here, the district court correctly concluded that SB 826 satisfies intermediate scrutiny.

NCPPR cannot plausibly plead that SB 826 is unconstitutional in light of the Supreme Court's and this Court's precedents, which have recognized numerous circumstances where laws, like SB 826, may use sex-based classifications to remedy economic discrimination against women. In *Califano v. Webster*, for

example, the Supreme Court upheld a provision of the Social Security Act that allowed women to exclude more of their "lower earning years" for purposes of calculating old-age insurance benefits than similarly-situated men, which in turn resulted in a higher monthly benefit payment for women. 430 U.S. 313, 314-17 (1977) (per curiam). This differential treatment did not violate the Equal Protection Clause because it was "not a result of archaic and overbroad generalizations about women," or the "role-typing society has long imposed upon women, such as casual assumptions that women are the weaker sex or more likely to be child-rearers or dependents." *Id.* at 317 (citations and quotation marks omitted). Instead, the statute operated "directly to compensate women for past economic discrimination": women had been "unfairly hindered from earning as much as men," and eliminating additional low-earning years from their benefits calculation "work[ed] directly to remedy some part of the effect of past discrimination." *Id.* at 318; *see also Kahn v. Shevin*, 416 U.S. 351, 353-356 (1974) (upholding a law that granted a $500 exemption from property taxes to widows but not widowers to account for the challenges women face in earning equal pay); *Schlesinger v. Ballard*, 419 U.S. 498, 505-510 (1975) (upholding a policy that afforded women in the military more time than men to achieve a certain rank because women could not be assigned to combat missions or duty on most Navy vessels and thus did not have the same opportunity to compile a record).

Applying intermediate scrutiny, this Court has similarly rejected facial challenges against programs designed to address economic discrimination against women. In *Associated General Contractors of California*, the Court rejected a facial challenge to a city ordinance that gave women-owned businesses preferences in securing municipal contracts. *See* 813 F.2d at 939-942.[18] The ordinance sought to compensate women "for the disparate treatment they have suffered in the business community" and "the bureaucratic inertia in the city's contracting procedures that ha[d] perpetuated the disadvantages flowing from that treatment." *Id.* at 940-41. Although the ordinance gave women an "advantage in a large number of businesses and professions," this Court concluded that it "hew[ed] closely enough to the city's goal" to survive a facial challenge. *Id.* at 941. Even though the city's program "extend[ed] preferences to some fields where women are not disadvantaged," experience had shown that these were the "exceptions," and that women still faced discrimination in "most fields." *Id.* at 942.

In *Coral Construction*, the Court again rejected a facial challenge to a county contracting preference meant to redress discrimination against women. *Coral Constr.*, 941 F.2d at 931-933. Notably, the Court denied the plaintiff's facial

---

[18] The Court also upheld a preference for local-owned businesses, but struck down a preference for minority-owned businesses. *See Assoc. Gen. Contractors of Cal.*, 813 F.2d at 944; *see also Coral Constr.*, 941 F.2d at 926 (holding similar minority preference unconstitutional "at least in part").

challenge without relying on the factual record: it recited its ruling in *Associated General Contractors of California* to conclude that the county had a "legitimate and important interest in remedying the many disadvantages that confront women business owners" and that "the set-aside and preference methods are legitimate means of furthering [that] objective." *Id.* at 932. Only when the Court discussed an as-applied challenge did the Court invoke "the record presently before [it.]" *Id.* at 932.[19]

NCPPR's opening brief ignores *Webster*, *Kahn*, and *Schlesinger*, and it ignores how this Court's binding precedent in *Associated General Contractors of California* and *Coral Construction* squarely rejected facial challenges to gender-conscious programs like the one NCPPR raises here. Under these precedents, the district court properly dismissed NCPPR's complaint.

**B. SB 826 Substantially Relates to the Important State Interest in Remedying Sex Discrimination on the Boards of California's Publicly Held Corporations**

SB 826 follows the path laid out by the Supreme Court and this Court: it satisfies intermediate scrutiny because it advances the important state interest in

---

[19] *Associated General Contractors of California* suggested that it may have reached a different conclusion if there were a challenge to the preference for women-owned businesses "as applied to an industry where women were not disadvantaged," but left that question for "another day." 813 F.2d at 942. *Coral Construction* likewise rejected a facial challenge, while also rejecting an as-applied challenge with respect to the preferences for women-owned businesses in the construction industry. 941 F.2d at 932-933.

remedying discrimination against women in the board selection process, and its provisions substantially relate to that goal.

1. SB 826 was adopted to help women overcome the "firmly entrenched practices" that kept them from competing on a level playing field. *Kahn*, 416 U.S. at 353; *see also Coral Constr.*, 941 F.2d at 932 (recognizing the "legitimate and important interest in remedying the many disadvantages that confront women business owners"). In 2018, before SB 826 was adopted, one-fourth of California's Russell 3000 corporations "ha[d] NO women on their boards of directors[.]" Cal. Stat. 2018, ch. 954, § 1(e) (capitalization in original). For the remaining corporations, women held only 15.5% of total board seats. *Id.* The disparities were particularly stark for smaller California corporations, almost half of which did not have a single woman director. Cal. Stat. 2018, ch. 954 § 1(e)(4).

The Legislature also found that this pattern of discrimination was widespread and long-standing. *See* MJN, Ex. 3 at 14-15. Nearly thirty years ago, the Legislature found that a "glass ceiling" blocked women from boards of publicly held corporations. MJN, Ex. 16. Decades later, the glass ceiling remained: nearly half of the 75 largest corporations that went public nationwide from 2014 to 2016 did so without a single woman on their boards. Cal. Stat. 2018, ch. 954, § 1(f)(3). This held true across the boards of California's publicly held corporations in every industry and every region. Up to 59% of companies in some industries had *no*

women on their boards; and women made up no more than 15.5% of all board directors in every industry except utilities (where women still made up just 24.7% of total directors). MJN, Ex. 27 at 11; *see supra* p. 8. Across regions, the percentage of women directors ranged from only 2.6% of directors in the Central Valley to 15.2% of directors in the Central Coast. MJN, Ex. 27 at 13; *see supra* p. 8.

As the Legislature found, this persistent exclusion and underrepresentation resulted from a board selection process rife with discrimination. SB 826's findings cite a Credit Suisse report that details multiple studies documenting how discrimination against women "maintains the glass ceiling" for corporate board positions. MJN, Ex. 29 at 32-34, 37 (citing research demonstrating sex-based "double standards"; "implicit favoritism" for men in how qualifications are rated; and Yale double-blind study where male applicants with an identical resume to female applicants were offered a higher starting salary and rated higher on "competence, hireability," and desirability for mentorship); *see* Cal. Stat. 2018, ch. 954, § 1(c)(2) (citing 2014 Credit Suisse study). Similarly, the Senate Office of Research identified sex-based "stereotypes" and double standards as part of the many "barriers to women's participation in corporate leadership[.]" MJN, Ex. 17 at 1-2. Citing a meta-analysis of 69 studies, the Senate Office of Research found that men were "overwhelmingly" rewarded for displaying "independence" or

"competitiveness," while women who did the same were punished. *Id.* at 2; *see also* MJN, Ex. 29 at 33, 37. Even when women were as equally qualified as men—graduating, for example, from the same "MBA programs at leading business schools"—discrimination against women ensured that "male graduates were *twice* as likely as their female counterparts" to be selected for corporate leadership. MJN, Ex. 17 at 3 (emphasis added) (citing Nancy M. Carter & Christine Silva, Pipeline's Broken Promise, Catalyst 4 (2010), https://tinyurl.com/mvx6f7w7).[20]

Additionally, corporate board members and recruiters testified before the Legislature about how the secretive and insular board selection process maintains a male-dominated network that excludes women. As one board recruiter explained, the board selection process is "not a competition" like an ordinary job application, "where you line up the best candidates and the best one is chosen." MJN, Ex. 3 at 6. Instead, witnesses described how a corporation's nominating and governance committee typically meets behind closed doors to select a new director from candidates whom they already know, a pool of candidates that tends to be male. *See id.* at 7 (testifying that boards normally "only interview one" candidate for a

---

[20] The report cited by the Senate Office of Research observes that this figure holds true "even after taking into account total experience, time since MBA, first post-MBA job level, industry, and global region of work." Nancy M. Carter & Christine Silva, Pipeline's Broken Promise, Catalyst 4 (2010), https://tinyurl.com/mvx6f7w7.

vacancy, " generally a man"). In that process, board members and recruiters testified about how boards often select male "university buddies or golf course buddies, or friends" already known to the corporation's leadership, and how these boards form these networks through private clubs that often expressly excluded women from their membership. MJN, Ex. 5 at 13. Former board members observed that these biases maintained an all-male network, MJN, Ex. 9 at 115 ("[T]ypically . . . a man . . . being replaced on a board . . . will be replaced by another man."), leading the Legislature to find that the boards of publicly held corporations have created an "old boys' network" that largely excludes women. MJN, Ex. 10 at 8. *See W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 992 (9th Cir. 2005) (accepting evidence of "institutional wall[s] and old-boy network[s]" as discrimination justifying race-conscious and sex-conscious remedial program (alterations in original)); *cf. Assoc. Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1197–98 (9th Cir. 2013) (recognizing "difficulties . . . breaking into the 'good ole boy' network" as discrimination).

Even in rare moments where a board considered a woman candidate, witnesses observed how boards expressly discriminated against women during the process. Witnesses testified that boards asked for a woman "who doesn't talk too much" or "disrupt too much." MJN, Ex. 2 at 8; *see also* MJN, Ex. 9 at 125 (same).

Such stereotypes and bias amount to discrimination. *See Assoc. Gen. Contractors of Cal.*, 813 F.2d at 939–40 ("[M]any of the disadvantages women have suffered [in the realms of business and employment] result from stereotypes concerning their proper roles and abilities."); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-252 (1989) (plurality opinion) (recognizing that sex stereotyping is relevant to a discrimination claim); *Lynn v. Regents of Univ. of Cal.* 656 F.2d 1337, 1343 & n.5 (9th Cir. 1981) (concluding that decisions motivated by discriminatory attitudes relating to sex are probative of discrimination).

And in hearings held months before SB 826's introduction, the Legislature found the "prevalence" of other forms of discrimination against women seeking board positions, such as discrimination against women who return from maternity leave and the "exclusion of female employees from social interactions at work," denying women the professional networking opportunities critical for board selection. *See* MJN, Ex. 9 at 18-19; *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (recognizing the "pervasive, although at times more subtle" discrimination faced by women); *see also Equal Emp. Opportunity Comm'n v. Inland Marine Indus.*, 729 F.2d 1229, 1235-36 (9th Cir. 1984) (holding that implicit or subconscious bias constitutes evidence of intentional discrimination).

Thus, because SB 826 aims to remedy the systemic discrimination that denies women the full and equal opportunity to lead on boards, the "members of the

gender benefitted by" SB 826 "actually suffer a disadvantage related to the classification" and the law advances an important, constitutional purpose. *Assoc. Gen. Contractors of Cal.*, 813 F.2d at 940.

2. Further, SB 826 "substantially relate[s]" to remedying this gender discrimination. *See Coral Constr.*, 941 F.2d at 932. The law addresses a discrete problem: discrimination against women in the corporate board-selection process and pipeline. MJN, Ex. 11 at 12. It applies only to the boards of California's publicly held corporations, Cal. Corp. Code § 301.3(a), approximately 700 companies, less than one tenth of one percent of the more than one million private stock corporations registered in California. *See supra*, p. 19 & note 11. It employs a flexible floor that allows corporations to add as many seats to their boards as they want—and thus add as many men to their boards as they want—so long as a "critical mass" of seats are filled by women. *See* Cal. Corp. Code § 301.3(a)-(b).

To remedy this discrimination, SB 826 targets the specific practices that keep women out of the boardrooms of California's publicly held corporations. Contrary to NCPPR's argument that SB 826 seeks "sex-based balancing as an end in itself" (AOB 10), by requiring California boards to add qualified women, SB 826 gives women the opportunity to lead and counteract the sex-based stereotypes and bias that had previously kept them out. *See* Cal. Stat. 2018, ch. 954, § 1(g)(1). In doing so, it enables those women to then draw on a gender-diverse range of talent when

selecting subsequent candidates for new board positions. *See* MJN, Ex. 9 at 111 (adding women to boards "open[s] the door"). Additionally, SB 826's remedy focuses on attaining a "critical mass," consistent with legislative findings showing that a critical mass is necessary to "create[] an environment where women are no longer seen as outsiders" and prevent stereotyping, bias, and exclusion inside the board room. Cal. Stat. 2018, ch. 954, § 1(g)(1). And NCPPR's erroneous argument notwithstanding (AOB 15), the Supreme Court and this Court have recognized the importance of "critical mass" as a remedial measure to address and prevent further discrimination. *See e.g.*, *Virginia*, 518 U.S. at 523 (noting that "'critical mass' . . . provide[s] the female cadets with a positive . . . experience" in institution that historically excluded them); *Eldredge v. Carpenters 46 N. Cal. Cntys. Joint Apprenticeship & Training Comm.*, 94 F.3d 1366, 1372 (9th Cir. 1996) ("Until a critical mass of women has successfully entered the carpentry trade, it is unlikely that other women will believe that the arbitrary barriers to their admission have been lifted."). Further, by requiring boards to add women—but permitting boards to add as many seats, and men, as they wish, Cal. Corp. Code § 301.3(a), SB 826's provisions ensure that the law is "not unduly onerous." *Coral Constr.*, 941 F.2d at 932.

Moreover, California adopted SB 826 only after decades of other efforts to remedy sex discrimination in board selection proved ineffective. As detailed

above, *see supra* pp. 13-16, those efforts date back to at least 1959, when the State first barred sex discrimination in private corporations and employment. *See* Cal. Civ. Code § 51; Cal. Gov't Code § 12940(a). By 1993, public and private entities alike had created and maintained registries identifying qualified women candidates to eliminate what male corporate leaders claimed to be the barrier to women serving on boards—their inability to find qualified women. *See supra* p. 13. But despite the creation of registries by California and others listing countless qualified women, corporate leaders still refused to let women into the boardroom.

In 2008, the State Controller tried a different tact; he directed CalPERS and CalSTRS—two of the largest institutional investors in the world—to prioritize corporate board diversity when they invest, a market-based solution that should have proved effective. *See* MJN, Ex. 18 at 1 & n.4. Over the next several years, CalPERS and CalSTRS undertook even greater efforts to promote gender diversity, including publishing evidence about the benefits of gender diversity on corporate boards and petitioning the SEC to promulgate regulations requiring proxy statements to disclose board nominees' gender. *Supra* pp. 14-15. In 2011, the California Insurance Commissioner championed an initiative to educate corporations about the benefits of board diversity and required boards to publish and disaggregate data on board composition by gender and other factors. And in 2013, the Legislature adopted Senate Concurrent Resolution No. 62, in which it

41

urged corporations to have a minimum number of women directors on their board within three years. S. Conc. Res. No. 62, 2013–2014 Leg., Reg. Sess. (Cal. 2013).

But gender discrimination in board selection persisted. As a Senate Committee found, despite decades of efforts by the State and others, "not much ha[d] changed." MJN, Ex. 11 at 2. From 2006 to 2018, the percentage of California board seats held by women crawled from 8.8% to 15.5%. *Compare* MJN, Ex. 27 at 6, *with* Cal. Stat. 2018, ch. 954, § 1(e). At that rate, without concerted action, it would have taken more than 40 years for women to have the equal opportunity to serve on a corporate board. Cal. Stats. 2018, ch. 954, § 1(f)(1)-(2). Without taking further "proactive steps" through SB 826, MJN, Ex. 12 at 1, Ex. 13 at 2 (bill analyses), the Legislature found that the "impenetrable walls of discrimination" would continue blocking qualified women from California's publicly held boards. MJN, Ex. 6 at 35; *see also, e.g.*, *id.* at 53 ("[W]e've tried other methods to get to the same result. . . . And the answer has been, go pound sand."); MJN, Ex. 24 (Insurance Commissioner's letter telling the Legislature in 2018 that despite his five-year efforts, "80 percent of insurance company governing board seats were held by men").

And, unlike every prior effort, SB 826 has worked. As this Court observed, "early results have shown" that SB 826 "has nearly quadrupled the rate of companies adding women to their boards[.]" *Meland I*, 2 F.4th at 846 & n.3. And

42

as the district court recognized, "before the legislation, 29% of California companies that would have been subject to the law 'had all-male boards, [and] as of March 1, 2021, only 1.3% . . . have all-male boards.'" *Meland II*, 2021 WL 6118651, at *8 (omission in original). Such results reflect how SB 826's means are have "further[ed]" and are "substantially related," *see Coral Construction*, 941 F.2d at 932, to its goal of breaking down the long-standing barriers that have denied women the equal opportunity to lead on boards.

## II.   NCPPR's Contrary Arguments Lack Merit

NCPPR makes three main arguments on appeal. First, NCPPR claims that California lacked an important government interest when enacting SB 826. AOB 9-12. Second, NCPPR claims that SB 826 does not substantially relate to any important interest. AOB 12-21. Third, NCPPR argues that the district court erred in the legal standard it applied. AOB 23-25.

None of these arguments are availing. NCPPR's first argument ignores express and repeat statements by the Legislature that it enacted SB 826 to remedy sex discrimination against women. Meanwhile, NCPPR's substantial relationship arguments rely primarily on precedents applying strict scrutiny to race-conscious programs, *see* AOB 12-17—even though this Court has repeatedly held that strict scrutiny does not govern the specific question presented here and that intermediate scrutiny requires a different conclusion. *See Assoc. Gen. Contractors of Cal.*, 813

43

at 939-942; *Coral Constr.*, 941 F.2d at 930-933. Finally, NCPPR's argument that the district court conflated the standards for a motion to dismiss and motion for preliminary injunction misreads the court's ruling, which observed that NCPPR's claim cannot meet the demanding standard for facial challenges under this Court's precedent applying intermediate scrutiny.

### A. NCPPR Cannot Plead that SB 826 Does Not Serve an Important Government Interest

NCPPR first argues that it "alleged" that SB 826 "does not further an important governmental interest." AOB 9. That is incorrect. Indeed, NCPPR concedes that the State can have an important interest in remedying sex discrimination, AOB 10, which is exactly what SB 826 aims to do.[21] As the Supreme Court has explained, laws may use sex-based classifications to "promot[e] equal employment" and "advance full development of the talent and capacities of our Nation's people," *Virginia*, 518 U.S. at 533, which is precisely what California did when enacting SB 826 to "improve opportunities for women in the workplace." Cal. Stat. 2018, ch. 954, § 1(a). Further, SB 826's findings

---

[21] NCPPR erroneously claims that remedying sex discrimination is the "only" interest that can justify a law using sex-based classifications. AOB 10. The Supreme Court has held that "[s]ex classifications may be used" not only to "compensate women 'for particular economic disabilities[,]'" but also to "advance full development of the talent and capacities of our Nation's people." *Virginia*, 518 U.S. at 533. Even under strict scrutiny, the Supreme Court has "never held that the only governmental use of race that can survive strict scrutiny is remedying past discrimination." *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003).

expressly refer to the "lack of gender diversity on corporate boards" and the "lack [of] female directors," SB 826, § 1(d), (e)(4), and the Legislature expressly stated that it enacted SB 826 "to remedy a long and well-documented history of discrimination depriving women of equal opportunity (or, in many cases, any opportunity at all) to serve on corporate boards." MJN, Ex. 11 at 12.

The Legislature also repeatedly stated its goal of ending discrimination throughout bill analyses, legislative hearings, and in the bill author's letter to the Governor, seeking his signature. *See, e.g.*, MJN, Ex. 15 at 4, 8 (stating that SB 826 seeks to redress "past discrimination and differences in opportunity" and that the "dearth of women in the board room mirrors a larger pattern of inequity in leadership"); MJN, Ex. 14 at 2 (stating that the board gender "disparity raises important questions and concerns related to structural discrimination and gender equity"); MJN, Ex. 3 at 14-15 ("[Women] will not have the opportunity to overcome what has really been long[-]standing discrimination throughout the process. That's part of our responsibility to put opportunities forward to ensure that we are, in fact, addressing discrimination as we see it."); MJN, Ex. 6 at 35 ("[W]e, as policymakers . . . have a responsibility to try to break open those impenetrable walls of discrimination."); MJN, Ex. 6 at 53 ("Why are we not in the board rooms?

45

. . . We are eminently qualified. But what we have is a history of discrimination that, unless we blast it open, sadly, is not going to change.").[22]

To the extent NCPPR claims that SB 826 cannot aim to remedy discrimination because the word "discrimination" is not used in its text, AOB 11, this argument also fails. The Supreme Court and this Court have never applied a magic word rule requiring statutes to invoke the word "discrimination" to be upheld as a remedial statute. *Cf.* U.S. Const., amend. XIV (not using the word "discrimination" once in its text); *compare also Schlesinger*, 419 U.S. at 508 (upholding gender-conscious remedial statute that did not use the term discrimination, but rather had "the goal to provide women officers with 'fair and equitable career advancement programs'") *with* S. Conc. Res. No. 62, 2013–2014 Leg., Reg. Sess. (Cal. 2013) (precursor to SB 826 seeking to "encourage equitable and diverse gender representation on corporate boards"). Instead, courts consider the State's justifications for a law challenged under the Equal Protection Clause, *see Michael M. v. Superior Court*, 450 U.S. 464, 469-70 (1981), unless "an examination of the legislative scheme and its history demonstrates that it could not

---

[22] *See also* MJN, Ex. 6 at 52 ("[T]here is a discrimination, there is a ceiling, and women haven't been able to penetrate that ceiling by asking, by urging, by encouraging. It just hasn't happened."); MJN, Ex. 2 at 22 (describing "blanket discrimination" in board selection).

have been the goal of the legislation." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975).[23] Here, the legislative record is replete with statements and findings reflecting SB 826's goal of remedying discrimination against women in the board selection process. *See supra* at pp. 45-46 & note 22.

Nor can NCPPR claim that the State lacked "specific evidence of discrimination" against women when enacting SB 826. AOB 24. Even under the more demanding standard of strict scrutiny, this Court has rejected the argument that "strict scrutiny requires [the government] to provide evidence of 'specific acts' of 'deliberate' discrimination" to justify an affirmative action program. *Assoc. Gen. Contractors of Am.*, 713 F.3d at 1196. Here, SB 826's legislative findings and legislative history provide far greater evidence of discrimination than this Court has found necessary to uphold a gender-conscious remedial statute under intermediate scrutiny. *Compare supra* pp. 5-12, *with Coral Constr.*, 941 F.2d at 932-33 (requiring only "[s]ome degree" of discrimination and citing a single affidavit to hold that "[t]he record adequately indicates discrimination against women in the King County construction industry").

---

[23] Even when applying the more rigorous strict scrutiny standard in race-related cases, courts consider the legislative record to discern the statute's purpose. *See Richmond v. J.A. Croson Co.*, 488 U.S. 469, 499-504 (1989) (plurality opinion).

### B.   NCPPR Cannot Plead that SB 826 is not Substantially Related to its Goal of Remedying Sex-Discrimination in Board Selection

NCPPR next claims that SB 826 does not substantially relate to its interest in remedying discrimination, but NCPPR misapprehends both the law's function and the appropriate level of scrutiny that applies here. *See Assoc. Gen. Contractors of Cal.*, 813 at 939-942; *Coral Constr.*, 941 F.2d at 930-933.

1. To begin, NCPPR argues that SB 826 is unconstitutional because it imposes a "rigid quota." AOB 13-16. But SB 826 sets no limit on the number of "opportunities" or "available seats," *Grutter v. Bollinger*, 539 U.S. 306, 335 (2003), open to men; it simply requires corporations to add a certain number of women on corporate boards, *see* Cal. Corp. Code § 301.3(a)-(b). In this respect, SB 826 differs fundamentally from the cases NCPPR cites, each of which involved a strict mandate that allocated a fixed resource among a defined pool of applicants, such as construction firms bidding for a contract or students applying for limited seats in an incoming class. *See Bakke*, 438 U.S. at 272 (admissions for 100 seats in a medical school class); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 477 (1989) (plurality opinion) (fixed percentage of city subcontract funds); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 704 (9th Cir. 1997) (fixed percentage of state subcontract funds); *cf. Higgins v. City of Vallejo*, 823 F.2d 351, 360 (9th Cir. 1987) (upholding minority promotion program, in part, because program did not deny a livelihood to a non-minority person).

48

Even if SB 826 could be fairly characterized as a "quota," that is not the dispositive issue. There is no case that applies a rule that such minimum gender diversity requirements are per se unconstitutional. *See Califano*, 430 U.S. at 314-315, 317; *Kahn*, 416 U.S. at 353-355; *Schlesinger*, 419 U.S. at 505-510; *Coral Constr.*, 941 F.2d at 930-33; *Assoc. Gen. Contractors of Cal.*, 813 F.2d at 939-42. Indeed, every case NCPPR invokes involves race-based classifications. *See* AOB 13-15 (citing *Fullilove v. Klutznick*, 448 U.S. 448 (1980) (plurality opinion); *Bakke*, 438 U.S. at 265; *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Grutter*, 539 U.S. at 309; and *Croson*, 488 U.S. at 499).[24] Moreover, while racial classifications must be "'narrowly' tailored to the government's objective, there is no requirement that gender-based statutes be 'drawn as precisely as [they] might have been.'" *Assoc. Gen. Contractors of Cal.*, 813 F.2d at 942 (alteration in original) (citations omitted). Here, SB 826 "hews closely enough to the [State's] goal of compensating women for the disadvantages they have suffered[.]" *See id.* at 941.[25]

---

[24] Though NCPPR cites *Coral Construction*, AOB 14, NCPPR notably cites the portion of the opinion addressing a *race-based* program, not the portion of the opinion addressing the gender-based program also at issue in the case. *Compare Coral Constr.*, 941 F.2d at 922-24 *with id.* at 929-33.

[25] NCPPR's assertion that that SB 826 must contain an "opt-out, waiver, or good faith provision[]," AOB 15, fails for the same reason: this Court has never specified those kind of provisos when evaluating gender-based (as opposed to race-based) classifications. NCPPR cites rulings that involve *race-based* programs. *See* AOB 15 (citing *Croson*, 488 U.S. at 508 (contracting preference for racial minority

Additionally, the board selection process is different from other application processes because it is not an open competition. In the public contracting and school admissions cases NCPPR cites (AOB 13-15), race-conscious requirements proved problematic because they denied applicants "individualized consideration" that they would receive in open "competition." *Grutter*, 539 U.S. at 334. By contrast, the typical board-selection process includes no vacancy advertisement, application process, nor defined candidate pool, and board candidates are not evaluated against one another. MJN, Ex. 5 at 14 ("[I]t's not like a regular job search, where there are people compared against one another."); MJN, Ex. 3 at 6 (testifying that board selection is "not a competition . . . where you line up the best candidates and the best one is chosen"). Thus, rather than interfering with corporations' ability to consider candidates on an individualized basis, SB 826 merely prompts corporations to expand their selection process to women who were "never afforded the chance to compete with [other] applicants" in the first place. *Bakke*, 438 U.S. at 319.

2. NCPPR also argues that SB 826 is overbroad because it does not target specific industries, geographic regions, or company sizes. AOB 17-18. However, this Court has already rejected precisely the same argument. *See Assoc. Gen.*

---

businesses); *Coral Constr.*, 941 F.2d at 924 (same); *Fullilove*, 448 U.S. at 454 (same)).

*Contractors of Cal.*, 813 F.2d at 941-42; *Coral Constr.*, 941 F.2d at 932. And, here, the Legislature appropriately declined to restrict SB 826 to certain industries, regions, or company sizes in light of legislative evidence showing that women are excluded from and vastly underrepresented on corporate boards in every industry, across every part of the State, and in companies big and small. *See supra* p. 8; *cf. also Assoc. Gen. Contractors of Am.*, 713 F.3d at 1199 (upholding race-conscious remedial program that did not "distinguish[] between construction and engineering contracts," as there are "sound policy reasons to not require such parsing, including the fact that there is substantial overlap").

NCPPR observes only that there are differences in the number of women on boards based on the size of the corporation. *See* AOB 17-18. But this single variation demonstrates only that women are significantly underrepresented even in the best case scenarios. *Compare* Cal. Stat. 2018, ch. 954, § 1(e)(4) (nearly half of the smallest 50 California corporations in the Russell 3000 had no women directors), *with id.* § 1(e) (one quarter of all California corporations in the Russell 3000 had no women directors).

In any event, even if NCPPR could establish that women were not disadvantaged in securing corporate board seats in some sectors (which it cannot), its claim for facial relief still fails. As this Court explained in *Associated General Contractors of California*, a gender-classification like SB 826 must survive a facial

attack so long as women are disadvantaged in "most fields." 813 F.2d at 942. That is clearly the case when it comes to corporate board selections. *See supra* pp. 5-12.

3. NCPPR also briefly asserts that SB 826 is unconstitutional because it does not contain a sunset provision. AOB 18-19. Even for race-based programs, however, "[a]n explicit or immediately foreseeable end date has never been required for an affirmative action plan to be valid." *Doe v. Kamehameha Schools* 470 F.3d 827, 846 (9th Cir. 2006) (en banc); *see also Grutter*, 539 U.S. at 313-16 (upholding school affirmative action policy that lacked a sunset provision); *Coral Constr.*, 941 F.2d at 914 (upholding county's sex-conscious affirmative action policy without a sunset provision). And the out-of-circuit cases NCPPR cites (*see* AOB 18) are unpersuasive. For example, in *Ensley Branch, N.A.A.C.P. v. Seibels*, the Eleventh Circuit held that the district court abused its discretion by failing to modify consent decrees governing the hiring of women in public employment entered 13 years earlier in light of evidence that the decrees had "done little or nothing to promote the development of selection procedures that are fair to women." 31 F.3d 1548, 1581 (11th Cir. 1994). Here, by contrast, SB 826 has only been in effect for three years, and in that time it has already been effective. *See supra* pp. 42-43.

In addition, SB 826 requires the Secretary to collect and publish data annually, Cal. Corp. Code § 301.3(d), which allows the Legislature, Secretary, and

the public to regularly review the need for and application of SB 826. The Legislature's decision to adopt annual reviews accounts for the long-standing nature of sex discrimination on California's publicly held boards and the State's duty to remedy discrimination both now and in the future. *Cf. Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) ("Where racial discrimination is concerned, 'the [district] court has not merely the power but the duty to render a decree which will . . . eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" (alteration in original)); *Clemens v. Centurylink Inc.*, 874 F.3d 1113, 1116 (9th Cir. 2017) (same).

4. NCPPR further claims that SB 826 relies on and reinforces "stereotyped notions of the roles and abilities of women." AOB 19-21. But NCPPR's conclusory claims are both incorrect and insufficient. As an initial matter, NCPPR's complaint fails to make any allegations about the law's purported reliance on stereotypes. *See generally* ER-67-76. Even considering NCPPR's post-hoc arguments in lieu of the allegations in the complaint, NCPPR's brief provides only "bare assertions" that the Legislature adopted SB 826 "because of" stereotypes, presenting the type of conclusory allegations that courts have seen fit to dismiss, time and again. *See Iqbal*, 556 U.S. at 680-81 (rejecting bare allegations that the government acted with discriminatory purpose).

NCPPR claims that the Legislature's findings include generalizations about women; in fact, the findings describe how "*companies*" that have gender diverse boards are (for example) "more likely to 'create a sustainable future'" because diverse boards introduce a diversity of perspectives to improve the management of corporations. *See, e.g.*, Cal. Stat. 2018, ch. 954 § 1(c)(3) (emphasis added); *see also* MJN, Ex. 9 at 114; *cf. Grutter*, 539 U.S. at 330. These findings in no way make "archaic and overbroad generalizations about women," such as the "role-typing society has long imposed upon women, such as casual assumptions that women are the weaker sex or more likely to be child-rearers or independents." *Califano*, 430 U.S. at 317 (citations and quotation marks omitted).

Indeed, these legislative findings underscore why SB 826 was necessary: qualified women were being kept off corporate boards despite the strong business case for including them. And the State may adopt sex-conscious remedial programs to ensure that actual differences between the professional experiences of men and women do not impede the ability of women to "fair[ly] and equitabl[y]" advance their careers. *Schlesinger*, 419 U.S. at 508.

NCPPR's assertion that SB 826 "creates . . . the idea that women can't make it without government help," AOB 20, is plainly unsupported. On the contrary, the legislative record shows that there were hundreds of thousands of women who were eminently qualified to serve on California's boards before 2018, but denied

the opportunity to do so because of a discriminatory selection process that prevented them from competing at all. *See supra* pp. 4-6. While great strides with respect to women in the workplace have been made in the last 50 years, when it comes to boardrooms in the State's publicly held corporations, the "job market [was] inhospitable," as a result of "overt discrimination" and the "male-dominated culture." *Kahn*, 416 U.S. at 353.

### C. The District Court Properly Relied on Established Precedent to Dismiss NCPPR's Claim for Failure to State a Facial Challenge

Finally, NCPPR claims that the district court erred by applying the standard for a preliminary injunction and by considering facts from a preliminary injunction motion when granting a motion to dismiss. AOB 23-25.[26] But NCPPR quotes a single sentence from the district court out of context, citing a moment where the district court referenced its ruling regarding the *Meland* preliminary injunction as part of a question to counsel. AOB 24; *see* SER-17-18. The court's tentative ruling at the beginning of the hearing made clear that the court relied upon the demanding standard for a facial challenge and the *cases* it cited in *Meland* applying intermediate scrutiny: when considering "the scrutiny standards" applicable, the district court did not "think a facial challenge can . . . at least based on [its] prior

[26] When dismissing NCPPR's complaint, the district court incorporated its reasoning dismissing the same claim against the same statute in *Alliance. See supra* p. 24. Thus, the Secretary focuses on the district court's reasoning in *Alliance. See also* AOB 6 n.1 (same).

ruling [in *Meland*] *and [its] reading of the case law involving this gender law*, can go forward." SER-11 (emphasis added). And when ruling at the end of the hearing, the court again emphasized the facial standard and the import of established precedent:

> [P]laintiff has not plausibly alleged that all applications of SB 826 are unconstitutional . . . nor does the *case law* that was cited in support of plaintiff's position support its argument that all applications are unconstitutional.
>
> Significantly, none of the *cases* that plaintiff cites specifically addresses minimum gender diversity requirements let alone applies a rule that such minimum gender diversity requirements are per se unconstitutional.

SER-29 (emphasis added). Consistent with this Court's precedent, the court gave NCPPR the opportunity to amend its complaint to bring an as-applied challenge. ER-4; ER-45-46. But NCPPR chose not to take the opportunity. ER-4.

In any event, reversal is not warranted here even assuming the district court improperly considered evidence in granting the Secretary's motion to dismiss. This Court may affirm the district court's order on any ground available in the record.[27]

---

[27] If this Court concludes that the district court erred in dismissing NCPPR's claim, it should remand this matter back to the district court so that the parties may introduce additional evidence about whether SB 826 satisfies intermediate scrutiny. *See generally* Appellee's Answering Brief at 31-56, *Meland v. Weber*, No. 22-15149 (9th Cir. Mar. 28, 2022) (Dkt. 35) (discussing evidence introduced in opposition to plaintiff's motion for a preliminary injunction demonstrating that SB 826 is substantially related to an important government interest).

*See Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020). As explained above, NCPPR's claim fails in light of the record that was in front of the Legislature when it considered SB 826—which courts may consider at the motion to dismiss stage, *see supra* pp. 3 note 2, 28, 30—and this Court's and the Supreme Court's precedents. As discussed above, *see supra* p. 33, the Supreme Court and this Court have repeatedly recognized that States may adopt statutes like SB 826 to remedy the entrenched discrimination that has barred women from equal opportunities. *See, e.g.*, *Califano*, 430 U.S. at 314-17; *Kahn*, 416 U.S. at 352-356; *Schlesinger*, 419 U.S. at 505-510; *Coral Constr.*, 941 F.2d at 929-32 (rejecting facial challenge to sex-conscious remedial law under intermediate scrutiny); *Assoc. Gen. Contractors of Cal.*, 813 F.2d at 939-42 (same). SB 826 is "substantial[ly] relat[ed]" to that "important government interest," *Coral Constr.*, 941 F.2d at 931, and passes constitutional muster, as SB 826 is a law designed to remedy the long-standing sex discrimination that has denied women the full and equal opportunity to lead on corporate boards—a law designed to enable qualified women to break through the "[g]lass ceiling . . . bolted shut with metal." MJN, Ex. 8 at 5.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  November 3, 2022

Respectfully submitted,

_s/Delbert Tran_

ROB BONTA
_Attorney General of California_
MICHAEL L. NEWMAN
_Senior Assistant Attorney General_
LAURA FAER
_Supervising Deputy Attorney General_
EDWARD NUGENT
DELBERT TRAN
_Deputy Attorneys General_
CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
(415) 229-0110
Delbert.Tran@doj.ca.gov
_Attorneys for Appellee_

## STATEMENT OF RELATED CASES

This case is related to *Meland v. Weber*, No. 22-15149, which involves the same claim (Fourteenth Amendment Equal Protection Clause) against the same statute (SB 826) brought by an appellant represented by the same counsel representing appellant in the instant appeal. The *Meland* appeal has been fully briefed, but this Court *sua sponte* held the appeal "in abeyance until any appeal of the decision in *Crest et al. v. Padilla*, Case No. 19STCV27651 (Los Angeles Sup. Ct.) becomes final." Order, *Meland v. Weber*, No. 22-15149 (9th Cir. Jun. 6, 2022) (Dkt. 60).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15822

I am the attorney or self-represented party.

**This brief contains** | 13,923 | **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ◉ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*
    - ○ it is a joint brief submitted by separately represented parties;
    - ○ a party or parties are filing a single brief in response to multiple briefs; or
    - ○ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated [        ].
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Delbert Tran | **Date** | 11/03/2022
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/2018*